# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CR419-107 |
| | ) | |
| RONALD E. WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND REPORT AND RECOMMENDATION

In the early hours of January 4, 2019, a resident of the apartments at 111 Edgewater Road in Savannah, Georgia, was awakened by the sound of gunshots.  Law enforcement's response to those shots led to defendant Ronald Williams' current federal prosecution on one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g).  *See* doc. 1 (Indictment).  Williams moves to suppress evidence discovered in the apartment where he was staying, doc. 30, the identification of a witness, doc. 31, statements he made to officers after his detention, doc. 32, and he seeks an opinion from the Court as to whether he qualifies as an "armed career criminal," under 18 U.S.C. § 924(e), doc. 34.  The Government opposes.  Doc. 42.  On November 18,

2019, the Court held a hearing on all of defendant's motions.[1]  For the following reasons, explained more fully below, Williams' motions should be or are denied.

## FACTS

Since the facts relevant to the various motions are distinct, the Court will forego a full introductory recitation.  The specific facts relevant to each motion will be discussed in the appropriate sections below.  Some background context is, however, appropriate.[2]  At approximately 4:00 a.m. on January 4, 2019, Savannah Police Department officers responded to a report of gunfire at an apartment complex in Savannah, Georgia.  Doc. 30 at 1.  Officer Suppa, who was off-duty, testified that he was awakened by what he judged to be gunfire.  He looked out of his bedroom window and saw an African-American male wearing all black clothes

---

[1]  Defendant also moved for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Doc. 33.  The Government opposed the hearing on the grounds that Williams has failed to make the required preliminary showing of a knowing or reckless falsehood in the warrant affidavit that was necessary to the finding of probable cause.  *See* doc. 42 at 33-34.  At the hearing, the Court heard the parties' arguments on the necessity for a *Franks* hearing and determined that Williams had not made the required showing.  His motion was, therefore, denied.  *See* doc. 56 (Minute Entry).

[2]  The facts recited here are largely undisputed or clearly established by the admitted exhibits.  To the extent that the recitation relies on Officer Suppa's testimony, the Court found him fully credible.

2

standing on a balcony across a courtyard holding a gun.[3]   He also observed that individual enter a particular apartment.  He notified the police and reported his observations directly to the responding officers when they arrived.

Based on Suppa's report, officers approached the identified apartment.  Body-worn camera video, admitted at the hearing, recorded officers' observation of spent shell casings on the ground below the balcony area where Suppa reported the individual with the gun.  Officers knocked on the door of the apartment and, after a brief delay, Williams answered.  Officers immediately handcuffed him and asked him if there was anyone else in the apartment.  He indicated that there was another occupant, his "cousin," who was asleep.   Officers roused the other occupant, subsequently identified as Mr. Hezekiah Frazier, and he exited the apartment.  The events from that point are the discussed in the relevant substantive analysis below.

---

[3]  Officer Suppa identified Williams at the scene, after he was detained by police.  He also identified Williams in the courtroom.   To the extent that both of these identifications are challenged by Williams, the Court does not consider them as established facts.

## ANLYSIS

### A.   Armed Career Criminal Enhancement

Williams' request that the Court determine whether he qualifies as an armed career criminal under 18 U.S.C. § 924 can be resolved with dispatch.  Defendant cites no authority for a pre-trial determination of the enhancement's application to a particular defendant.  *See generally* doc. 34.  The Government opposes such a hearing and points out that defendant is aware of his criminal history and counsel can provide guidance on the implications of that history.  *See* doc. 42 at 37-38.  The Government is correct.

As the Eleventh Circuit has explained, albeit in a different context, legal proceedings place individuals in positions where they "must make difficult decisions that can have adverse consequences . . . .  Needless to say, the decisionmakers would benefit greatly by having guidance as to the potential legal ramifications of their decisions.  Furnishing such guidance prior to the making of the decision, however, is the role of counsel, not the courts." *Hendrix v. Poonai*, 662 F.2d 719, 722 (11th Cir. 1981).  The Government has informed Williams of the possible application of an enhancement.  Doc. 2 (Penalty Certification).

Determination of the validity of such an enhancement, prior to a pre-sentencing investigation, is counsel's responsibility.  His request for a pretrial determination of the enhancement is **DENIED**.  Doc. 34

### B. Motion to suppress unreasonable seizure

When Williams answered the door to the apartment, officers immediately directed him to come out and placed him in handcuffs.  Doc. 30 at 2.  They briefly questioned him about whether there was anyone else in the apartment and whether he had identification.  *Id.*  After Frazier exited the apartment, officers directed Williams to accompany them to a nearby patrol car.  *Id.*  After entering the apartment briefly to retrieve his driver's license, Williams accompanied officers to the patrol car.  *Id.*  Body-worn camera video confirms that Williams stood, leaning against the car, while an officer asked him questions about his identity and his relationship to the apartment.  *Id.*  Williams answered those questions, as discussed more fully below.  Officer Scott then informed Williams that he needed to secure him in the back of the patrol car, while he conducted further investigation.  Williams strongly objected to being placed in the car; and ultimately informed Officer Scott that there was "nothing" Scott could say to convince him to comply.  Officers Scott and

Woods then forcibly placed Williams into the back of the car.  *See* doc. 30 at 3; Ex. 1 (video recorded by Scott's body-worn camera).

Williams argues that he was subjected to a *de facto* arrest, without a warrant.  Doc. 30 at 5-7.  Specifically, he contends that he was under arrest "when . . . two police officers in full uniform led him away in handcuffs to the parking lot of the apartment complex and placed him against Officer Scott's patrol car."  *Id.* at 5.  He contends that officers lacked probable cause to effect a warrantless arrest and any suspicion they had "arose not from their own observations but solely from Mr. Suppa's account that an unidentified individual was holding a handgun and went into [the] apartment" in question.  *Id.* at 6.  The Government responds that officers had reasonable suspicion to detain Williams, and that he was not arrested until they had probable cause, based on his refusal to comply with a lawful command.  Doc. 42 at 10-15.  Williams replies that officers lacked probable cause to arrest him because he had already been illegally detained, and thus "was justified in refusing to enter the car."  Doc. 51 at 4.

Brief investigatory seizures do not violate the Fourth Amendment when they are based on an officer's "reasonable, articulable suspicion that

criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).   Reasonable suspicion "requires at least a minimal level of objective justification for making the stop." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).   The existence of reasonable suspicion "should be determined from the totality of the circumstances and . . . the 'collective knowledge' of all the officers involved in the stop." *United States v. Cotton*, 721 F.2d 350, 352 (11th Cir. 1983).

In *Adams v. Williams*, 407 U.S. 143 (1972), the Court expressly rejected the argument "that reasonable cause for a [*Terry* stop] can only be based on the officer's personal observation, rather than on information supplied by another person." *Id.* at 147.  In *Adams*, the Court found that the fact that an informant was "known to [the officer] personally and had provided him with information in the past," was sufficient "indicia of reliability" to justify the subsequent stop. *Id.*  Certainly, information that an off-duty police officer supplies is no less reliable than information from a habitual citizen informant, even one who has proven reliable.

Since the responding officers could depend upon on Suppa's reliable report, they certainly had reasonable suspicion to believe that an

individual wearing all black had fired a handgun and entered a particular apartment. Upon their approach to the apartment Suppa indicated, officers observed spent shell casings on the ground. Those observations provided further corroboration, if not confirmation, of the witness' account. When Williams answered the door matching the general description Suppa provided, *i.e.* African-American male, and wearing matching clothing, *i.e.* all black clothing, officers certainly had reasonable suspicion to detain Williams to conduct their investigation. The fact that officers handcuffed defendant and directed him to move from the immediate vicinity of the apartment to the patrol car did not convert the *Terry* stop into a *de facto* arrest. *See, e.g., United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985) ("[N]either handcuffing nor other restraints will *automatically* convert a *Terry* stop into a *de facto* arrest requiring probable cause."); *United States v. Williams*, 2011 WL 765728, at * 4 (S.D. Ga. Jan. 12, 2011) ("[T]he Eleventh Circuit has recognized that during the course of a *Terry* stop officers may draw their firearms and handcuff a suspect before proceeding with their investigation." (citing *United States v. Acosta*, 363

8

F.3d 1141, 1147 (11th Cir. 2004); *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995)).

In circumstances involving firearms, the Eleventh Circuit has recognized that even securing a suspect *in* a patrol car does not convert a *Terry* stop into an arrest. *See United States v. Williams*, 185 F. App'x 866, 870 (11th Cir. 2006) (handcuffing and securing defendant in a patrol car were justified by a reasonable investigative purpose, *i.e.* "to secure a potentially armed and dangerous suspect involved in two shooting incidents while investigating the shootings themselves."). The Eleventh Circuit has similarly recognized that a suspect may be legitimately detained in a police car "to prevent [the suspect] from jeopardizing their investigation of [his] residence." *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000). Since detaining Williams *in* the patrol car would not *per se* convert the detention into an arrest, detaining him *near* the car does not either.

Since none of the circumstances Williams identified necessarily convert the *Terry* stop into a *de facto* arrest, the Court must conduct the wholistic, factor-based analysis to determine whether the detention exceeded the scope of a permissible investigatory stop. *See, United States*

9

*v. Acosta*, 363 F.3d 1141, 1145-46 (11th Cir. 2004). The Eleventh Circuit has explained that "[t]o . . . more objectively draw[ ] the line between a *Terry* stop in an individual case, we apply four non-exclusive factors . . ., the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention and the duration of the detention." *Id.*; *see also United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988).

As the Government argues, and as discussed above, the officers' purpose in detaining Williams does not weigh in favor of construing that detention as an arrest. *See* doc. 42 at 13. Officer safety, particularly in cases involving firearms, is a legitimate law enforcement purpose. Preventing a suspect from interfering with a premises search is also a legitimate purpose. Williams' argument that officers had an *illegitimate* purpose depends upon his contention that officers removed him to void his objection to a search of the premises or his demand that they obtain a warrant before searching. *See* doc. 30 at 7 n. 3 ("[O]fficers unlawfully seized and removed Mr. Williams from the residence in order to get the consent of the co-occupant, Mr. Frazier."). However, as discussed more fully below, that contention is belied by Williams' repeated disclaimers

10

that he resided in the apartment.  If officers had no reason to believe he resided in the apartment, they had no reason to think his consent or objection to the search was relevant.  There is, thus, no reason to suppose they had to resort to pretextually detaining him.  Given the totality of the facts, it appears that the purpose of Williams' detention was investigatory.

The second factor distinguishing between a *Terry* stop and a *de facto* arrest is the officers' diligence in pursuing the investigation.  This factor, too, weighs against a determination that Williams' detention ripened into an arrest.  As the Government points out, the body-worn camera footage reflects officers' continuous investigation from the moment that Williams was detained until they discovered the gun.  As in *Acosta*, "[n]othing in the record indicates that the police were less than prompt in carrying out their on-the-scene investigation.  Each investigatory act logically led to the next act which was done without delay."  363 F.3d at 1146.

As to the third factor, Williams argues that officers' intrusive methods exceeded what was reasonably necessary to ensure their safety.  *See* doc. 51 at 6.  Specifically, he contends that once Williams was

11

handcuffed and searched for weapons, "any concern for officer safety was
. . . alleviated." *Id.* However, officer safety is not eliminated merely
because a suspect is unarmed. A suspect who flees or becomes physically
belligerent, even if unarmed, is still a threat to officers' safety, to say
nothing of the threat to their own safety or the public's. Those concerns
are magnified if officers' attention must be focused on investigative tasks,
and not limited to standing guard over a suspect. Although the third
factor rests closer to equipoise, it tilts, if only slightly, against finding a
*de facto* arrest.

The final factor, the duration of the detention, weighs strongly
against finding a *de facto* arrest. As the Government points out, there is
body-worn camera footage that establishes exactly the duration between
Williams exiting the apartment and his arrest for refusing to comply with
Officer Scott's command to sit in the patrol car. *See* doc. 42 at 14. Less
than eleven minutes elapsed while Williams was detained prior to his
arrest.[4] The Eleventh Circuit has made it clear that, "there is no rigid
time limitation or bright line rule regarding the permissible duration of

---

[4]   Officer Scott's body-worn camera records Williams exiting the apartment at
timestamp 5:45. *See* Ex. 1. He states that there is nothing Scott can say to convince
him to comply with Scott's instructions at approximately 16:27, and he is forcibly
placed in the patrol car at 16:29. *Id.*

a *Terry* stop." *Acosta*, 363 F.3d at 1147. *Acosta* found, nevertheless, that "[t]hirty minutes duration is not beyond the pale of reasonableness for *Terry* stops," and that the defendant in *Gil* "was detained for approximately seventy-five minutes in handcuffs in the back of a patrol car" without exceeding the permissible duration of a *Terry* stop. *Id.* at 1148 (citing *Gil,* 204 F.3d at 1350). The Court simply cannot say that eleven minutes—given that officers diligently pursued their investigation—exceeds, or even approaches, the duration at which a *Terry* stop ripens into a *de facto* arrest.

In summary, the only factor in the analysis that weighs in favor of finding that Williams' detention was anything more than a *Terry* stop is the minimal extent to which the means used arguably exceeded those absolutely necessary for officer safety. All of the other factors weigh against finding a *de facto* arrest, in several instances that weight is considerable. The totality of the circumstances, as reflected in the video recordings of Williams' detention, show that he was subject only to permissible invasions of his liberty, consistent with *Terry*, until he was placed under arrest for obstruction after refusing to comply with Officer Scott's directions. Since there was no illegal detention, none of the

evidence resulting from the detention is suppressible.  Williams' motion, therefore should be **DENIED**.[5]  Doc. 30.

## C. Search of the apartment

Officers discovered the gun at issue in this case after a search of the apartment where Williams was staying.  Williams was removed to a nearby patrol car, where he objected to any search of the apartment without a warrant.  The other occupant, Mr. Hezekiah Frazier, subsequently consented to a search of the apartment.  During that search officers discovered the gun.  Williams' objections to the admissibility of the gun depend upon the efficacy of his objection to the search and the validity of Frazier's consent.

Whether Williams' objection could preclude officers from searching the apartment depends upon his relationship to the property, which the parties dispute.  The Government contends that he was not a co-occupant, but, at most, an overnight guest.  *See* doc. 42 at 21.  However, the Court need not determine whether Williams' admittedly unorthodox living situation was more analogous to a permissive guest or a co-tenant.

---

[5]  The remaining issues raised in Williams' Motion to Suppress Evidence, doc. 30, related to the propriety of the warrantless search of the apartment, are discussed below.

Whether or not he was, in fact, a co-occupant, the officers on the scene reasonably concluded that he was not.  Moreover, the Government cites Williams' own repeated statements that the apartment was not "his." *See* doc. 42 at 5.  Even if Williams were a co-tenant, the facts available to the officers, particularly in light of his repeated assertions that the apartment was not his, gave rise to the officers' reasonable belief that Frazier had the authority to consent to the search.

In general, individuals who share a property each have full authority to consent to a search of that property.  *See, e.g., United States v. Matlock*, 415 U.S. 164, 171 (1974) (explaining that prior consent-to-search cases, "make clear that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.").  In *Georgia v. Randolph*, 547 U.S. 103 (2006), the Court recognized a limited caveat to the co-occupant-consent principle.  The Court held that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search

15

unreasonable and invalid as to him." *Id.* at 106. The effect of an occupant's objection on a co-occupant's consent to a search was further refined in *Fernandez v. California*, 571 U.S. 292 (2014). *Fernandez* clarified that a co-occupant's objection did not preclude his co-occupant's consent in perpetuity; once the objector is no longer "present," officers may rely on the present co-occupant's consent. *Id.* at 301-06. The question Williams poses is whether his objection to a search of the apartment was sufficient, under *Randolph* and *Fernandez*, to preclude Frazier's subsequent consent. *See* doc. 30 at 8-11.

The Government argues that Williams lacked a sufficient connection to the property to render his objection effective against Fraizer's consent. The Government's position is that Williams was no more than a permissive guest in the apartment and granting such an occupant a "right to overrule" the permanent occupant's consent would be an impermissible extension of *Randolph*. Doc. 42 at 22. Williams counters that, although he was not a traditional "resident," he was more than a mere guest in the apartment. *See, e.g.,* doc. 51 at 8. Assuming that Williams' relationship to the property is best approximated as a permissive "guest," the Government relies on this Court's opinion in

*United States v. Childers*, 2006 WL 3289935 (S.D. Ga. Nov. 8, 2006), in support of the claim that an owner has such a superior interest in his property that his guest's objection cannot overrule his consent to a search of that property. *See* doc. 42 at 20.

Defendant argues that *Childers* is inapposite, given that it involved trespassers, not permissive guests, objecting to a search. *See* doc. 51 at 7 n. 7. Defendant's distinction of *Childers* is persuasive. Judge Barfield expressly noted that the defendant in *Childers* was "not authorized" to be in the house. 2006 WL 3289935, at * 3. As an effective trespasser, his objection "could not override the owner's consent to search . . . ." *Id.* at * 4. Despite defendant's viable distinction of *Childers*, other courts have found that guests' objections cannot override the consent of a permanent resident. In *Joseph v. Donahue*, the court concluded that a long-term guest's objection was insufficient to implicate *Randolph*. 392 F. Supp. 3d 973, 986 (D. Minn. 2019) ("Although an overnight guest has a legitimate expectation of privacy in the home, the guest has no legal interest in the premises and does not have the legal authority to determine who may or may not enter the household. [Cit.] Thus, the [permanent resident] had authority recognized in law and social practice to prevail over her son's

objection."); *see also United States v. Lopez*, 2019 WL 3812518, at * (D. Conn. Aug. 13, 2019) ("[A] mere overnight guest's objection to a search does not override the consent of a tenant, occupant, or resident with a possessory interest in the property.").

Williams urges the Court to apply *Randolph* without regard to the subtleties of property interest, given the wide variety of living arrangements. *See* doc. 51 at 7 (arguing that *Randolph* does not take relative authority of occupants into account "*absent* some recognized hierarchy," as between parents and children or in military housing). That argument is not without some appeal. However, the facts are against him. The video recordings from the officers' body-worn cameras captured Williams expressly disavowing any connection to the property several times. This is simply not a case in which the police were confronted with an occupant who expressly asserted his right to exclude officers from premises, and was disregarded because, for example, his name did not appear on a lease. Here, Williams emphatically and repeatedly sought to disassociate himself from the apartment.[6] That

_____

[6] The Government's Exhibit 1 – body-worn camera footage from an Officer Scott, who did not testify – recorded officers' interaction with Williams. Officer Scott asked Williams if he "stay[ed]" at the apartment and Williams clearly responded, "Not really," and that he comes to the apartment "from time to time." *See* Ex. 1 at 9:33-38.

disassociation was consistent with all the evidence officers on the scene had; Williams' driver's license listed a different address, and Frazier described Williams as, at most, a transitory visitor.  Based on all of that evidence the officers' belief that Frazier had authority to consent was reasonable.

The officers' reasonable belief in Frazier's authority to consent to a search is sufficient; whether or not it was correct.  The Supreme Court has made clear that officers need only have a "reasonable" belief that the consenting party has authority over the premises to be searched.  *See Illinois v. Rodriguez*, 497 U.S. 177, 186-87 (1990).  The Court explained that "what is generally demanded [by the Fourth Amendment] of the many factual determinations that must regularly be made by agents of

---

He later asks Officer Scott whether officers can come to "[his] apartment," and then, unprompted, clarifies that it's "not really [his] apartment."  *Id.* at 10:31-32.  When Officer Scott asks for Williams' address, he responds that it is listed on the ID.  *Id.* at 10:56-57.  Officer Scott clarifies, "You live in Rincon?" and Williams responds that the Rincon address is his "mailing address."  Officer Scott again seeks clarification, asking "What is your physical address when you're not here?" and Williams responds that he "doesn't really have" one.  *Id.* at 10:58-11:04.  Later, as he objects to the circumstances of his detention and in anticipation of a search of the apartment, Williams *again* refers to "[his] apartment," only to again correct himself, saying: "well really, not *my apartment*, my cousin [sic] apartment."  *Id.* at 13:13-14 (emphasis added).  He later demands to see a search warrant, "on behalf of [his] cousin."  *Id.* at 14:55.  Officer Scott acknowledges that Williams is "only trying to protect [his] rights," Williams responds: "*No, no, no*, I'm not trying to protect my rights, I'm trying to protect my cousin's rights."  *Id.* at 15:22-24.  Officers were entitled to rely on Williams repeated, unequivocal, and emphatic statements disassociating himself from the apartment.

19

the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable." *Id.* at 185.  In the context of consent searches, "[t]he Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, that it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a felon who is about to escape." *Id.* at 186.  The operative question is whether the facts available to the officer on the scene would "warrant a man of reasonable caution in the belief" that the consenting party had authority over the premises." *Id.* at 188; *see also, e.g., United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008) ("[A] warrantless entry is valid when it is based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed authority over the premises.").  The facts available to the officers—bolstered by Williams' multiple denials of residency—

unequivocally indicated that Williams was no more than a guest and that they could, indeed must, rely on Frazier's consent.

Regardless of Williams unorthodox living situation, Frazier's consent, despite Williams' objection, is valid based on the officers' reasonable belief that Williams was not a resident. The reasonableness of that belief is particularly strong here, given that it was based in substantial part upon Williams' own statements about his relationship to the property. Given that Williams' objection to the search—based on the facts available to officers—could not override Frazier's consent, the question of whether he was "physically present" in the sense *Randolph* required is moot. Similarly, the question of whether officers removed him in order to avoid his objection to the search is also moot. The propriety of the search depends upon Frazier's consent.

The question that remains, however, is whether Frazier's consent was voluntary. The Government bears the burden of establishing, by a preponderance of the evidence, that Frazier voluntarily consented to the search. *See United States v. Matlock*, 415 U.S. 164, 177 (1974) (finding that "the Government sustained its burden of proving by a preponderance of the evidence" that voluntary consent justified a search);

*United States v. Schmitz*, 469 F. App'x 772, 773 (11th Cir. 2012) ("[T]he government bears the burden of proving both (1) that consent existed and (2) that the consent was voluntary and not an acquiescence to a claim of lawful authority.").   The question of *whether* Frazier gave voluntary consent is tied to the parties' dispute over whether the search exceeded the scope of Frazier's consent.   *See, e.g., Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (citations omitted)).   The Court will, therefore, discuss all the issues related to Fraizer's consent together.[7]

---

[7] The Government suggests, in a footnote, that Williams may not have "standing" to challenge the validity of Frazier's consent. Doc. 42 at 24 n. 4. Williams replies, also in a footnote, that his standing derives from the illegality of his arrest, which provided officers with the opportunity to seek Frazier's consent despite Williams' objection. Doc. 51 at 9 n. 8. The Court is not convinced that Williams lacks "standing," merely because he might not have authority to contradict Frazier's consent to search. *See* doc. 42 at 24 n. 4. Nor is it convinced that he has "standing" merely because of his contention that his detention was illegitimate. *See* doc. 51 at 9 n. 8. Regardless, Fourth Amendment standing is not jurisdictional, but only an aspect of the merits of an allegation of a Fourth Amendment violation. *See, e.g., Byrd v. United States*, ___ U.S. ___, 138 S. Ct. 1518, 1530 (2018) ("Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim."). The Court, therefore, assumes without deciding that Williams has Fourth Amendment standing to put the Government to its burden of establishing Frazier's consent to the search.

"Generally, for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Calderon-Fuentes*, ___ F. App'x ___, 2019 WL 4389133, at * 2 (11th Cir. Sept. 13, 2019) (citing *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989)). "Voluntariness is 'not susceptible to neat talismanic definitions; rather the inquiry must be conducted on a case-by-case analysis' that is based on 'the totality of the circumstances.'" *United States v. Burwell*, 763 F. App'x 840, 846 (11th Cir. 2019) (quoting *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989). The relevant factors to determine voluntariness, "none of which is dispositive," include the voluntariness of the consenter's custodial status, whether officers employed coercive procedures, the extent of the consenter's cooperation with law enforcement, the consenter's awareness of his right to refuse, his education and intelligence, and his belief that no incriminating evidence will be found. *See id.* (quoting *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984)). "While the government is not required to prove that [the consenter] knew he had the right to refuse to consent, such knowledge or lack thereof is a factor to consider in determining

voluntariness." *Chemaly*, 741 F.2d at 1353 (citing, *inter alia*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 249 (1973)).

Officer Woods' body-worn camera captured his interaction with Frazier. Frazier is standing outside his front door when Officer Woods returns from assisting Officer Scott questioning Williams. As Woods approaches, he asks Frazier where the "gun is at?" Ex. 2 at 16:57. Frazier responds that he doesn't know whether Williams has a gun. *Id.* at 16:58. When Officer Woods asks whether officers can enter the apartment and "get the gun," Frazier points to Williams' belongings, *i.e.* "That's all of his stuff right there." *Id.* at 17:07. Woods asks if Frazier "minds if [he] take[s] a look," and the camera captures Frazier shaking his head "no." Officer Purnell's body-worn camera provides a clearer recording of Frazier's waiving his hand in an apparent affirmative response to Officer Woods' request. Ex. 7 at 14:07. Woods inspects the area, including several bags, which he does not open. *Id.* at 17:16-18:07. He then turns his attention to the kitchen, but his camera does not record Frazier's response. *Id.* at 18:08-18:41. After recording Woods and another officer searching the apartment's kitchen, Officer Woods' body camera captures Frazier leaning, in a relaxed posture, against the

24

apartment door observing the search.  *Id.* at 18:42.  Officer Woods then proceeds to the bedroom, leaving Fraizer at the door.  *Id.* at 19:36.  After Woods finds the gun, Frazier thanks the officers for removing it from his home.  *Id.* at 28:05.  Officer Woods' body-worn camera does not capture any indication from Frazier that his consent to the search was limited or that he objected to the search in any way.  At the hearing, Woods testified that he inferred Frazier's consent from his non-verbal cues.

Officer Scott's body-worn camera recorded his interactions with Fraizer while the search was taking place.  *See* Ex. 1 at 24:27.  During that interaction, Scott asks Fraizer if "it's alright with you that they're checking in" the apartment?  *Id.* at 24:52.  He follows-up with a question about Fraizer's knowledge of a gun.  Fraizer responds that he does not know anything about a gun, but he never expressly responds to Officer Scott's question confirming his consent.  *Id.* at 24:55-25:01.  He does not, however, respond to that question by disavowing consent or suggesting that his consent was limited.  Although his silence is not, itself, consent, it does support Officer Woods' interpretation that his earlier expression of consent was not limited in scope.

Williams has identified several facts he contends weigh against the voluntariness of Frazier's consent.  *See* doc. 51 at 10-11.  Certainly, officers did wake Frazier from sleep and Frazier did indicate that he was taking medication.  *See id.* at 10.  However, he does not appear in the videos, as defendant contends, "disoriented."  He responds appropriately to officers' questions and never protests that he is confused or disoriented, even in response to officer's apologies for waking him.  Further, the recordings do not entirely bear out Williams' contention that his standing "outside his door for over ten minutes," created a "police-dominated atmosphere".  *See id.* (quoting *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996)).  The recordings do show that he stood outside the door after officers asked him to.  The recordings do not, however, show a "police domination."  Fraizer never asks to reenter the apartment, and his posture while he waits appears relaxed.  Officers allow him to briefly reenter several times in the video, and when they do ask him back outside their requests are polite and conversational.  Finally, Williams' characterization of Officer Woods' initial question to Frazier as "accusatory" is also overstated.  Doc. 51 at 11.  Officer Woods does assert that officers "know" that Williams had a gun, but he does not

accuse Frazier of hiding it or even knowing that Williams had it. Defendant may be correct that such a question weighs against voluntariness, but any such weight is *de minimis*, at most.

Although the facts Williams identified do not weigh *heavily* against the voluntariness of Frazier's consent to the search, he does not bear the burden. Nevertheless, the facts the Government points to in favor of the consent's voluntariness satisfy its burden and outweigh those Williams proffers. Given the totality of the circumstances, the voluntariness of Frazier's consent might be clearer. Nevertheless, the evidence preponderates in favor of finding the consent voluntary. *See, e.g., United States v. Latimore*, 2014 WL 3109183, at * 11 (N.D. Ga. July 7, 2014) ("A preponderance of the evidence simply means an amount of evidence that is enough to persuade the Court that the existence of a fact is more probable than its non-existence," and collecting cases).

Frazier clearly indicated his consent to the search and his conduct, while he observed officers searching the apartment, ratified that consent. The Eleventh Circuit has explained that consent may be non-verbal. *See United States v. Crispin*, 181 F. App'x 935, 939 (11th Cir. 2006) ("The Court has previously found a search consensual where no verbal consent

27

was given but the defendant's body language indicated his assent to the search." (citing *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002)). To the extent that the scope of Frazier's initial consent might have been ambiguous, his observation of officers' search and his cooperation with it is evidence that his initial consent was general, and not limited to the area where Williams' belongings were. *See United States v. Batson*, 749 F. App'x 804, 806 (11th Cir. 2018) (noting defendant's "unconditional cooperation," in evaluating the voluntariness of a consent to search).

Based on the totality of the evidence, the Court should find that Frazier's gave his voluntary consent to search the entire apartment for the gun officers believed was hidden there. To be sure, officers might have solicited more explicit consent, and might have disclosed Frazier's right to refuse consent. Nevertheless, the Government has provided sufficient evidence that Frazier's consent was freely and voluntarily given. He unequivocally responded in the affirmative when Officer Woods asked for permission to search. To the extent that there might have been doubt about the scope of his consent, his observation of the search without protest only confirmed the reasonableness of Woods'

initial judgment that the consent was not limited. Finally, the factors that Williams identifies, while perhaps indicative, are ultimately not dispositive in the totality of the circumstances.

Given that officers had a reasonable basis to conclude that Frazier was the only appropriate party with authority to consent to a search of the apartment and the Government has borne its burden of proving, by a preponderance of the evidence, that his consent was voluntary, Williams' motion to suppress the fruits of the search should be **DENIED**. Doc. 30.

### D. Motion to suppress statements

Williams seeks to suppress statements he made after he was detained. *See* doc. 32 at 2-4. He argues, first, that any statements he made must be suppressed because they resulted from an illegal seizure. *Id.* at 2-3. Since the Court has determined that the seizure was not unlawful, it cannot taint the subsequent statements. He also argues that any statements he made must be suppressed because, whether or not he was arrested, he was "in custody," for *Miranda* purposes. *Id.* at 3-4. Since he was not informed of his rights, any statements he made must be suppressed. The Government responds that Williams was not in custody

when he made the statements, and, even if he were, the statements were not made in response to officers' interrogation.  *See* doc. 42 at 15.

"The [Supreme] Court in *Miranda* presumed that interrogation in certain custodial circumstances is inherently coercive and that statements made under those circumstances are inadmissible unless the suspect is specifically warned of his *Miranda* rights and freely decides to forgo those rights."  *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989) (alterations, quotes, and cite omitted).  To suppress statements based on the lack of *Miranda* warnings, the defendant bears the burden of demonstrating that he was in custody when he made them.  *See United States v. Robinson*, 2017 WL 3262417, at * (S.D. Ga. July 14, 2017) (citing *United States v. Peck*, 17 F. Supp. 3d 1345, 1353-55 (N.D. Ga. 2014)). "[T]he initial step [in the custody determination] is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave."  *Howes v. Fields*, 565 U.S. 499, 508-09 (2012) (alterations, quotes, and cites omitted).  However, "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry*

30

stop does not constitute *Miranda* custody." *Id.* at 510 (quotes and cite omitted).

The Government does not suggest – and the evidence cannot plausibly support – that Williams was free to leave after he was handcuffed. As discussed above, however, such freedom does not have "talismanic power," in applying *Miranda*. *Howes*, 565 U.S. at 437. The *Howes* Court noted that a typical *Terry* stop involves "a moderate number of questions to determine [a suspect's] identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439. The Court found that "[t]he comparatively nonthreatening character of [*Terry*] detentions . . . explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda." *Id.* at 440; *see also Thomson v. United States*, ___ F. App'x ___, 2019 WL 5260391, at * 3 (11th Cir. Oct. 17, 2019) (in the context of a *Terry* stop "*Miranda* warnings are typically not required."); *United States v. Partin*, 634 F. App'x 740, 748 (11th Cir. 2015) (detention that did not exceed the scope of a permissible *Terry* stop was not a "custodial interrogation" requiring *Miranda* warnings); *United States v. Middleton*, 2006 WL 156872, at * (S.D. Ga. Jan. 19, 2006) ("Pursuant to *Terry*, a law

enforcement official may stop a person based upon reasonable suspicion of criminal activity, and ask a sufficient number of questions to confirm or dispel the officer's suspicions."). Lack of *Miranda* warnings does not, therefore, warrant the suppression of any statement prior to Williams' arrest.

Clearly, however, Williams *was* arrested for obstruction when he refused Officer Scott's command to sit in the patrol car. From that point forward, he may have been in custody for *Miranda* purposes. However, it is not clear that there was any interrogation after his detention ripened into an arrest. Arguably, Williams' failure to articulate precisely—either at the hearing or in his filed suppression motion—what statements are suppressible is sufficient to refuse to suppress any of them. *See United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) ("A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented."). Further, the Government contends that "officers did not solicit Defendant's statements; instead, Defendant voluntarily initiated the conversation with the officers." Doc. 42 at 15.

32

To the extent that the submitted exhibits reflect Williams' interactions with officers after he was arrested and forcibly placed in the back of the patrol car, no interrogation occurs. The first contact any of the officers has after Williams' arrest is when Officer Scott enters the car where he is detained. Williams initiates a conversation with Officer Scott, captured on Scott's body-worn camera, when he asks what Scott is looking for on his computer. Ex. 1 at 17:12; 17:28. Officer Scott answers that he is looking for information on Williams. *Id.* at 17:40. Williams then volunteers that he is "on your computer," and "on parole." *Id.* at 17:41. The conversation continues for several minutes until Scott leaves the car, but it is absolutely clear that Williams is responsible for its continuation. *See id.* at 17:41-20:20.

When Officer Scott returns, Williams immediately begins asking Scott what he's going to be charged with. *Id.* at 31:28. Officer Scott asks Williams to confirm he's a convicted felon. *Id.* at 37:51. Williams' response is inaudible. Scott moves back to the driver's side of the car, apparently to continue talking with Williams. Officer Scott notices what appears to be blood on the car, opens the door and asks Williams if he's hurt. *Id.* at 38:30. In response, Williams commences a profanity laden

33

rant that continues for several minutes.  *Id.* at 38:37-45:01.[8]  He then asks Officer Scott to "listen" to what he has to say.  *Id.* at 45:01.  After he states that his life is in danger, he expressly invites Scott to "go ahead and write it in your report that I said that."  *Id.* at 45:40.  Williams shortly returns to shouting profanity.  *Id.* at 45:40-47:35.

Officer Scott asks, again, if there is anything he can say to induce Williams to comply with the search of his person, apparently conducted pursuant to Williams' arrest.  *Id.* at 47:35.  He, again, refuses, and officers complete the search and secure him in the car.  *Id.* at 47:35-49:20.  When Scott gets back in the car, Williams again begins talking to him, although his exact words are inaudible.  *Id.* at 50:49.  Williams continues his rant during the drive.  *Id.* at 15:50-.  Although Officer Scott does ask questions during the course of the conversation, none seem intended to solicit potentially incriminating information, but rather are—at most— attempts to keep a particularly belligerent arrestee from further bouts of profanity laced exposition.

---

[8]  The closest Officer Scott comes to asking a question is after Williams responds to the statement that he's under arrest for obstruction, by telling Scott he has already been arrested for obstruction.  Ex. 1 at 41:50.  Williams' response, "Don't worry about it," is not incriminating, however.  *Id.* at 14:51.

The recordings make clear that, during the period after Williams is arrested to the conclusion of the recording,[9] Williams is never "interrogated."  As the Eleventh Circuit has explained, *Miranda* itself established that "'any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.'"  *Sullivan v. Alabama*, 666 F.2d 478, 482 (11th Cir. 1982) (quoting *Miranda v. Arizona*, 384 U.S. 436. 478 (1966) (alterations omitted)).  In the absence of more specific argument about specific statements he alleges were the product of custodial "interrogation," Williams motion to suppress his "statements" generally, should be **DENIED**.  Doc. 30.

### E. Motion to suppress identification

Williams also seeks to suppress Officer Suppa's identification of him as the individual he saw holding a gun shortly after hearing shots, either pre-trial or in-court.  Doc. 31.  As discussed above, Officer Suppa was off-duty and a resident of the apartment complex where the shooting occurred.[10]  Suppa was awakened by the sound of several gunshots, and,

---

[9]   The recording does not include any recitation of Williams' *Miranda* rights and neither defendant's brief nor the Government's indicate when they were provided.

[10]   The following facts are based on Officer Suppa's testimony, which the Court found fully credible.

through his bedroom window, observed an individual standing on an open walkway or balcony opposite his window holding a gun. When officers arrived to investigate the gunshots, he provided them with a general description of that individual's appearance and attire. He also told them that he had seen the individual go into a particular apartment. After officers made contact with Williams, who answered the door of the apartment that Suppa identified, they proceeded to handcuff him and shortly escorted him to Officer Scott's patrol car. Suppa observed their travel to the patrol car, telephoned the officers, and volunteered that the individual whom officers were escorting was the individual he saw holding the gun shortly after he heard shots. During his testimony at the November 18, 2019 hearing, Officer Suppa again identified Williams as the man he saw holding the gun.

Williams challenges the admissibility of both identifications. Doc. 31. Specifically, he contends that the identification was the result of the illegal seizure. *Id.* at 3. Since the Court has concluded that there was no illegal seizure, the identification cannot be the result of such a seizure. To the extent that he seeks to suppress the identifications on that basis, then, his motion should be **DENIED**. Doc. 31. Williams also challenges

his identification on the grounds that it was the product of an unduly

suggestive procedure. *Id.* at 4. The Government opposes. Doc. 42 at 28-

33.

> As this Court has explained:
>
>> The admissibility of identification testimony where the witness
>> made an out-of-court identification is governed by a two-step
>> analysis. *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988).
>> The Court must initially determine whether the original
>> identification procedure was unduly suggestive. If the procedure
>> was not impermissibly suggestive, that ends the inquiry. *Id.* at
>> 895-96. If the identification procedure was suggestive, the Court
>> must then assess whether, under the totality of the
>> circumstances, the identification was nonetheless reliable. *Id.*
>> at 895. In making this assessment, the Court must consider the
>> five factors identified by the Supreme Court in *Neil v. Biggers*,
>> 409 U.S. 188, 199 (1972) (opportunity to view, degree of
>> attention, accuracy of the description, level of certainty, and
>> length of time between the crime and the identification).

*United States v. Hadden*, 2007 WL 1135523, at * 2 (S.D. Ga. Apr. 16,

2007). The Eleventh Circuit has made clear that, in the first part of

the analysis, impermissible suggestion occurs "'when the police have

arranged suggestive circumstances leading the witness to identify a

particular person as the perpetrator of the crime.'" *United States v.*

*Williams*, 688 F. App'x 895, (11th Cir. 2017) (quoting *United States v.*

*Elliot*, 732 F.3d 1307, 1309 (11th Cir. 2013)). "Where no improper

police conduct exists, exclusion of the out-of-court identification is

unnecessary." *Id.* (citing *Elliot*, 732 F.3d at 1310); *see also Perry v. New Hampshire*, 565 U.S. 228, 241 (2012) (explaining "[t]he due process check for reliability, *Braithewaite* made plain, comes into play only after the defendant establishes improper police conduct.").

Given the Court's conclusion that Williams' seizure was a permissible *Terry* stop, there is no suggestion of improper law enforcement activity. Suppa observed an individual holding a gun. He reported a general description of that individual to police, and further identified the apartment he had seen that individual enter. When police knocked at the door of that apartment, an individual matching the general description Suppa provided answered the door. As discussed above, based on their reasonable suspicion, officers detained that individual. Suppa observed that detention and contacted police to identify the individual they detained as the individual he observed with the gun. There is no indication of "suggestive procedure" in that sequence. As Williams' brief points out, there was a "complete lack" of procedure. Doc. 31 at 5. As such, he has failed to identify an "unduly suggestive" procedure.

Since Williams has not identified any impropriety by law enforcement officers, the Court finds that Suppa's out-of-court identification was not the result of unduly suggestive procedure. There is no need, therefore, to evaluate whether the identification is reliable. Further, since the out-of-court identification was not unduly suggestive, there is no need to determine whether the Government has proven the reliability of or independent source for Suppa's in-court identification of Williams. *See Masse v. Sec'y, Fla. Dept. of Corrs.*, 700 F. App'x 890, 895 (11th Cir. 2017) (in-court identification was reliable where there was no basis to suppress out-of-court show up identification); *United States v. Sebetich*, 776 F.2d 412, 418 (3d Cir. 1985) (where "the out-of-court identification was not impermissibly suggestive[,] . . . [t]he in-court identification could not therefore be suppressed." . . . "Because we concluded that the out-of-court identifications were not tainted, we perforce conclude that the in-court identification . . . is admissible, for the only colorable (or asserted) basis for the claim that the in-court identification is inadmissible is the supposed suggestiveness of the out-of-court identification procedures."); *see also, e.g., Jenkins v. Warrington*, 530 F. Supp. 121,

39

125 (D. Mont. 1982) ("The determination having been made that the admission of the out-of-court identification did not violate the petitioner's right to due process, it necessarily follows that the admission of the in-court identification could not have violated that right."). Williams' motion to suppress the identifications, therefore, should be **DENIED**. Doc. 31.

## CONCLUSION

In summary, Williams motion to suppress evidence should be **DENIED**. Doc. 30. His motion to suppress Suppa's out-of-court and in-court identification should be **DENIED**. Doc. 31. His motion to suppress statements he made after he was detained and arrested, but before he was read his *Miranda* rights, should be **DENIED**. Doc. 32. His motion for a *Franks* hearing was **DENIED** orally at the November 18, 2019 hearing. Doc. 33. Finally, his motion for a pretrial determination of whether his sentence in this case would be subject to an enhancement, pursuant to the Armed Career Criminal Act, 18 U.S.C. § 924(e), is **DENIED**. Doc. 34.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B)

and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to the R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO ORDERED AND REPORTED AND RECOMMENDED,** this 19th day of December, 2019.

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA